### 20293

In the Matter of Max B. CAUTHEN, Jr., et al., Respondents.

(229 S. E. (2d) 340)

*Messrs. Daniel R. McLeod, Atty. Gen., A. Camden Lewis* and *John L. Choate, Asst. Attys. Gen.,* of Columbia, *for Complainant.*

*Claude A. Taylor, Jr., Esq.,* of Spartanburg, *for Respondent Cauthen.*

*Charles A. Rice, Jr., Esq.,* of Spartanburg, *for Respondent Eubanks.*

*James D. Rowland, pro se.*

Oct. 21, 1976.

*Per Curiam:*

This disciplinary proceeding was commenced by the service on the respondents of a complaint charging the respondents with misconduct arising out of a check kiting operation.* Max B. Cauthen, Jr., and Raymond C. Eubanks, Jr., are attorneys who practice law in Spartanburg in partnership under the firm name of Cauthen and Eubanks. James D. Rowland is likewise a member of the Bar, but he has not engaged in practice for many years. During the time with which we are here concerned, he was engaged in the construction and land-development business in Spartanburg. Cauthen and Rowland had been friends since college days, and the firm of Cauthen and Eubanks had performed all of the legal work incident to the extensive construction operations carried on by Rowland since 1967 or 1968. The kiting operation was effectuated by the use of the Cauthen and Eu-

---

* Webster's Third New International Dictionary Unabridged (1964) defines the word "kite" as "to create a false bank balance by manipulating deposit accounts."

· In the case of *Falconi v. Federal Deposit Ins. Corp.,* 257 F. (2d) 287, 289 (3rd Cir. 1958), it is held that a "check kite" is a scheme whereby false credit is obtained by exchange and passing worthless checks between two banks.

banks Trust Account in the South Carolina National Bank (Spartanburg) and three accounts maintained by Rowland in the First Citizens Bank and Trust Company (Spartanburg).

Respondents Cauthen and Eubanks filed separate answers in which each admitted participation in the kiting operation, but specifically denied any knowledge of the nature of the operation until after its collapse. They placed sole responsibility for the scheme upon the respondent Rowland who is alleged to have misled and deceived them. Respondent Rowland did not file an answer to the complaint.

This matter was heard by a Panel on February 26, 1976, and a report was filed by it dated June 3, 1976. The report of the Panel found all respondents guilty of the misconduct charged in the complaint and recommended the following sanctions:

(1) James D. Rowland—permanent disbarment;

(2) Max B. Cauthen, Jr.,—indefinite suspension;

(3) Raymond C. Eubanks, Jr.,—public reprimand.

The full Board accepted the Panel report as to findings of fact and conclusions of law. The Board also accepted the sanctions recommended for Rowland and Eubanks, but lowered the sanction against respondent Cauthen from an indefinite suspension to a public reprimand.

For the sake of clarity, this opinion will treat each respondent separately.

### JAMES D. ROWLAND

At the outset of the hearing in this matter the respondent Rowland tendered his resignation from the South Carolina Bar. He admitted his participation in the kiting operation and conceded that he alone planned the scheme. Rowland assumed sole responsibility for all misconduct related to the kiting operation and has attempted to exculpate respondents Cauthen and Eubanks. Respondent Row-

land does not dispute any of the charges against him and has filed no return or brief to this Court's Rule to Show Cause.

## MAX B. CAUTHEN, JR.

Respondent Cauthen's defense to this proceeding is succinctly stated in the following excerpt from his brief:

"That the record clearly shows the Respondent Cauthen was an unknowing and ignorant participant in a scheme perpetrated, conjured-up, initiated and carried out by the Respondent Rowland."

In order for one to evaluate fully this defense, it is essentially to understand the size and nature of this kiting operation.

Respondent Rowland would draft checks payable to Cauthen and Eubanks, and Cauthen or Eubanks would simultaneously draft checks from their trust account payable to Rowland for an identical amount. This procedure would continue through the periodic exchange of checks until one of two alternative results occurred: (1) one of the parties received sufficient funds to deposit in his account to cover the fraudulent checks, or (2) the banks discovered the kiting operation and the "house of cards" collapsed. In December of 1974 the "house of cards" did collapse for the respondents, and two South Carolina banks were left with the accounts of the respondents overdrawn in the aggregate sum of $543,-415.80. This kiting operation continued from February 14, 1974, to December 19, 1974. The size of this scheme is almost incredible. Approximately 280 checks were exchanged by the respondents during this ten month period. Respondent Cauthen signed all except 37 of the checks for the partnership. Many of these checks were $100,000, or larger, and one check was in excess of $200,000. When the operation reached its peak in November, 1974, Cauthen and Eubanks deposited and withdrew from their trust account over $3,-

000,000 in this one month alone. As of December 31, 1974, the South Carolina National Bank had sustained an overdraft on the Cauthen and Eubanks trust account in the amount of $350,532.37. The First Citizens Bank and Trust Company sustained an overdraft on the various accounts of Rowland in the amount of $192,883.43. At the time of hearing this matter the banks were still owed approximately $475,000.00.

The contention by Cauthen that he was an innocent victim of Rowland's scheme is unbelievable when viewed in the context of the facts here presented. He engaged in sustained conduct extending over a period of 10 months with checks being drawn by him on the law firm's trust account almost daily. In some instances, more than one check was drawn on the same day. It is inconceivable that Cauthen, who had been practicing law for a period of 16 years and who had been formerly employed by a bank, would not have been aware of the purpose of this operation, yet Cauthen contends that he thought the checks given him for deposit were good. Certainly it would appear that the volume of these checks would have, at an early stage of the operation, put him on notice that there was a sinister purpose to Rowland's actions.

The only reasonable explanation that this Court can arrive at is that reached by the Panel and the Board that Cauthen did have guilty knowledge of the operation and that he was an active participant therein. The following from the Report of the Panel expresses its findings:

"[T]here was a pattern or course of conduct leading to the inescapable conclusion that this Respondent (Cauthen) at some point in time in 1974, knew that he was creating a false bank balance in his account with the South Carolina National Bank by depositing checks from the Respondent Rowland; that he knew the checks at the time of deposit were uncollectible; that he knew that if the Respondent Rowland did not receive monies in the near future that the 'kiting' operation would have to be continued or the shortage would

be apparent to the banks. We find as a fact that this Respondent in exercising ordinary prudence commensurate with his education and position in life would have known and did know that this 'kiting' operation was taking place."

## RAYMOND C. EUBANKS, JR.

From March to December of 1974, Eubanks signed approximately 37 checks payable to various accounts of Rowland, all 37 checks being a part of the kiting operation. The total of these checks signed by Eubanks exceeded $1,000,-000.00. They were spaced at intervals throughout the period of the operation. It should be noted that a successful kiting operation depends upon a continual exchange of checks. In June of 1974, Cauthen was on vacation and Eubanks signed 14 checks to Rowland during this period. Had Eubanks refused to exchange checks with Rowland at that time, the kite would have then collapsed.

The defense interposed by Eubanks is similar to that of Cauthen in that he admits his participation in the kiting operation, pleads ignorance to knowing at the time that he was involved in such a scheme and contends that he always believed that Rowland's checks were good.

In light of the foregoing, the Panel correctly found as follows:

"Respondent Eubanks knew that at the time he exchanged checks with Respondent Rowland that Rowland at that moment did not have sufficient funds in the bank to cover these checks. It would be inconceivable to come to any other conclusion based on the testimony and events that took place. It is also found by this Panel that Respondent Eubanks undoubtedly thought that even though there were no funds in the bank at the time that they would be forthcoming in the near future to cover checks. Nevertheless, having knowledge of this 'kiting' operation caused him to be guilty as an accomplice in this fraudulent operation."

It should be further noted that when the kiting operation collapsed in December 1974, the charge-back to the Cauthen and Eubanks Trust account caused a large overdraft which necessarily drew monies of other clients out of the trust account. However, no client lost any money because Cauthen and Eubanks reimbursed them from their personal funds.

From the foregoing consideration of facts we make the following conclusions of law with reference to each respondent:

### JAMES D. ROWLAND

1. Violated DR 1-102 (A) (3) by engaging in conduct involving moral turpitude.

2. Violated DR 1-102 (A) (4) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

3. Violated DR 1-102 (A) (5) by engaging in conduct that is prejudicial to the administration of justice.

4. Violated DR-1-102 (A) (6) by engaging in conduct that adversely reflects on his fitness to practice law.

5. Violated Section 4(d) of the South Carolina Supreme Court's Rule on Disciplinary Procedure by engaging in conduct tending to pollute or obstruct the administration of justice or to bring the courts or the legal profession into disrepute.

### MAX B. CAUTHEN, JR., AND RAYMOND C. EUBANKS, JR.

1. Violated DR 1-102 (A) (3) by engaging in conduct involving moral turpitude.

2. Violated DR 1-102 (A) (4) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

3. Violated DR 1-102 (A) (5) by engaging in conduct that is prejudicial to the administration of justice.

4. Violated DR 1-102 (A) (6) by engaging in conduct that adversely reflects on their fitness to practice law.

5. Violated Section 4(d) of the South Carolina Supreme Court's Rule on Disciplinary Procedure by engaging in con-

duct tending to pollute or obstruct the administration of justice or to bring the courts or the legal profession into disrepute.

6. Violated DR 7-102 (A) (7) by counseling and assisting their client Respondent Rowland in conduct that they knew to be illegal and fraudulent.

7. Violated DR 7-102 (A) (8) by knowingly engaging in illegal conduct and conduct contrary to other Disciplinary Rules in their representation of Respondent Rowland.

8. Violated DR 7-102 (B) (1) by failing to advise their client, Rowland, to rectify the fraud and by failing to reveal the fruad to the banks affected.

9. Violated DR 9-102 (A) by failing to keep all the funds of their clients in an identifiable bank account when the kiting operation collapsed.

The Board of Commissioners on Grievances and Discipline are officers of this Court commissioned and charged with the duty of investigating alleged misconduct on the part of their fellow members of the bar of this State and of reporting to this Court the proceedings of their inquiry and their findings and recommendations. However, it is the grave responsibility of this Court alone of adjudging from the record whether or not professional misconduct has been shown, and of taking appropriate disciplinary action when such misconduct is established. *Burns v. Clayton,* 237 S. C. 316, 117 S. E. (2d) 300 (1960). It is difficult to conceive of a case that would tend to undermine the reputation of the legal profession more than these attorneys' device of kiting to defraud the local banks of more than $500,000.00. The relative size of this operation is evidenced by the following testimony of Clarence C. Hutto, Jr., Senior Vice-President of South Carolina National Bank:

"Q. . . . would you consider this a large kite?
"A. It's the largest I have ever seen . . ."

We have carefully considered the discipline recommended by the Board. However, we find ourselves in disagreement with the recommendations for two of the respondents. The following discipline is hereby imposed:

Respondent James D. Rowland is permanently disbarred from the practice of law in this State.

Respondent Max B. Cauthen, Jr., is suspended for an indefinite period from the office of Attorney at Law.

Respondent Raymond C. Eubanks, Jr., is suspended for an indefinite period from the office of Attorney at Law.

Each of the respondents above named shall, within five (5) days from the service of this order upon him, surrender to the Clerk of this Court the certificate heretofore issued by this Court admitting him to practice.